FILED

2026 Jul-28  PM 03:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES HARRIS, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **1:25-cv-1793-EGL** |
| | ) | |
| **FRANK BISIGNANO,** | ) | |
| *Commissioner of* | ) | |
| *Social Security,* | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff James Harris, Jr. seeks judicial review of the Commissioner of Social Security's denial of his application for supplemental security income. *See* Doc. 12 at 1-2. Harris raises two arguments: that the Administrative Law Judge (ALJ) failed to evaluate a 2018 medical opinion as 20 C.F.R. § 416.920c requires, and that the ALJ's finding at step five of the sequential evaluation process rests on flawed vocational testimony and so lacks the support of substantial evidence. *Id.* at 4-5. After careful review of the administrative record and the parties' briefs, the Court **AFFIRMS** the Commissioner's decision.

## BACKGROUND

### A. Procedural Background

Harris applied for supplemental security income in May 2021, alleging that his disability began on March 11, 2020.[1] Doc. 8-3 at 12. The agency denied his claim initially on January 24, 2022, and on reconsideration on July 2, 2022. *Id.* An ALJ heard the case on January 5, 2023, and issued an unfavorable decision on February 27, 2023. *Id.* at 12, 27-28. The Appeals Council denied review, *id.* at 2-5, and Harris sought judicial review in this Court. Doc. 8-15 at 37-38. Upon the Commissioner's motion, the Court reversed and remanded for further proceedings. *Id.*; *see Harris v. Comm'r, Soc. Sec. Admin.*, No. 4:23-cv-1699, Doc. 11 (N.D. Ala. Feb. 27, 2024).

On remand, the Appeals Council vacated the 2023 decision and directed the ALJ to hold a new hearing, evaluate the medical opinions under 20 C.F.R. § 416.920c, reassess Harris's residual functional capacity, obtain vocational evidence, and identify and resolve any conflicts between that evidence and the Dictionary of Occupational Titles (DOT). Doc. 8-15 at 44-45. The same ALJ held a second hearing in October 2024, at which Harris and a vocational expert testified, Doc. 8-14 at 58-81, and issued a second unfavorable decision on October 30, 2024,

---

[1] The Commissioner states that Harris originally alleged an onset date in January 2018. Doc. 13 at 2 n.1. The discrepancy is immaterial. Supplemental security income is not payable for any month before the month after the application is filed, *see* 20 C.F.R. §§ 416.330, 416.335, so the period at issue runs from Harris's May 2021 application.

*id.* at 9-28. Harris filed written exceptions, Doc. 8-17 at 69-95, but the Appeals Council declined to assume jurisdiction, making the October 2024 decision the final decision of the Commissioner, Doc. 8-14 at 2-5; *see* 20 C.F.R. § 416.1484(a), (b)(2). Harris then filed this action. Doc. 1. He has exhausted his administrative remedies, and the Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

## B. Factual Background

Harris alleged disability based on sciatica, neuropathy, chronic obstructive pulmonary disease (COPD), high blood pressure, a stomach ulcer, emphysema, heart problems, and the effects of a stroke. Doc. 8-8 at 2-9, 13-19. He was fifty years old when he applied, holds a GED, and last worked refurbishing mobile homes. *Id.*

Harris testified at his first hearing that a damaged back, sciatica, and neuropathy in both feet made walking a struggle and kept him from working. Doc. 8-3 at 78-79. His COPD still flares when the weather changes, he testified, but "[l]ong as I work with it on albuterol, I'm able to not get completely winded," though walking still leaves him winded. *Id.* at 86. At his second hearing, he again acknowledged that he continued to manage his COPD with albuterol. Doc. 8-14 at 68.

Harris also has a long history of alcohol abuse. In 2021, healthcare providers noted that he was drinking a twelve-pack of beer and a half-pint of liquor every day and had been doing so for many years. *Id.* at 15, 22; Doc. 8-11 at 8. That March, he

spent five days in the hospital with an upper gastrointestinal bleed, accompanied by acute blood loss anemia, diffuse duodenitis, bleeding gastritis, and erosive esophagitis, attributed to alcohol and NSAID use. Doc. 8-11 at 45. His records reflect Alcoholics Anonymous attendance and court-ordered substance abuse treatment. Doc. 8-14 at 22; Doc. 8-9 at 3-4; Doc. 8-11 at 86.

## ALJ DECISION

To determine whether a claimant is disabled, an ALJ applies a five-step sequential evaluation process, asking whether the claimant (1) is engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals the severity of a listed impairment; (4) can perform any past relevant work; and, if not, (5) can adjust to other work that exists in significant numbers in the national economy. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

When a claimant found disabled under that framework suffers from a substance use disorder, one more step remains: the claimant is not disabled under the Act if alcoholism or drug addiction would be "a contributing factor material to" the disability determination. 42 U.S.C. § 1382c(a)(3)(J). Materiality turns on whether the claimant would still be disabled if he stopped using drugs or alcohol, 20 C.F.R. § 416.935(b)(1); SSR 13-2p, 2013 WL 621536 (S.S.A. Feb. 20, 2013), and

the claimant bears the burden of proving that his substance use is not material, *see Doughty v. Apfel*, 245 F.3d 1274, 1275-76, 1280-81 (11th Cir. 2001).

At step one, the ALJ found that Harris had not engaged in substantial gainful activity since March 11, 2020. Doc. 8-14 at 14. At step two, the ALJ found that Harris had nine severe impairments: emphysema, COPD, alcohol use disorder, peripheral neuropathy, ulcer, gastritis, depressive disorder, anxiety disorder, and degenerative disc disease. *Id.* at 15-17. At step three, the ALJ concluded that none of Harris's impairments, alone or in combination, met or medically equaled a listed impairment, but, considering all of Harris's impairments including his alcohol use, he had a marked limitation in concentration, persistence, and maintaining pace. *Id.* at 17-19.

The ALJ then assessed Harris's residual functional capacity (RFC) with the effects of his substance use included. She found that Harris could perform light work with substantial restrictions: he could lift and carry up to twenty pounds; would need to change positions from standing or walking to sitting for thirty minutes after every six hours of standing or walking, while remaining on task; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never ropes, ladders or scaffolds; could frequently reach, handle, and finger; could tolerate occasional exposure to weather, temperature extremes, wetness, humidity, vibration, and atmospheric conditions; could understand, remember, and carry out only "short,

5

simple tasks and instructions" and make only short, simple work-related decisions; could not perform production-rate work such as assembly-line work; and could tolerate only occasional workplace interaction and occasional changes in the work setting. *Id.* at 19. Most importantly, the ALJ found that Harris "can be expected to miss two or more days of work" each month. *Id.* She explained:

> The claimant has a history of substance abuse that has caused GI bleeds, dehydration, syncope, and other related issues for the claimant. Doctors noted that he was drinking a 12 pack of beer and a half pint of hard liquor per day in 2021. Records also show a history of AA attendance and court ordered treatment. The undersigned finds it reasonable that the claimant would miss two or more days of work per month due to his physical and mental symptoms which are exacerbated by chronic alcohol abuse.

*Id.* at 22 (exhibit citations omitted). With that capacity, Harris could not perform any work in the national economy, and the ALJ accordingly found Harris disabled when all of his impairments, including his substance use disorder, were considered. *Id.* at 24.

That finding did not end the matter, however. Because the record contained medical evidence of Harris's alcohol use disorder, the ALJ was required to determine which impairments would remain if he stopped drinking and whether those limitations would still be disabling. 20 C.F.R. § 416.935(b). She therefore worked through the sequential evaluation a second time on the assumption of abstinence.

6

Absent alcohol use, the ALJ found, Harris's remaining impairments would still be severe but would not meet or medically equal a listing, and his marked limitation in concentrating, persisting, or maintaining pace would improve to moderate. Doc. 8-14 at 24-26. His RFC "would generally remain the same," but "in the absence of substance abuse, the claimant would likely miss at most one day of work per month." *Id.* at 27. The ALJ tied Harris's gastrointestinal bleed and vertigo to his alcohol use; observed that he received only primary care during the relevant period, with no indication that he was ever intoxicated at an appointment or missed one "due to alcohol use or withdrawal symptoms"; and noted the absence of any continued treatment for his gastrointestinal issues or vertigo. *Id.*

Relying on the vocational expert's testimony, the ALJ found that Harris could perform three light, unskilled occupations: photocopy machine operator (DOT 207.685-014), with 75,000 jobs in the national economy; mail clerk (DOT 209.687-026), with 104,000 jobs; and counter clerk (DOT 249.366-010), with 120,000 jobs. *Id.* The expert stated that his testimony was consistent with the DOT. *Id.* at 79. Because Harris would not be disabled if he stopped using alcohol, the ALJ concluded that his substance use disorder was a contributing factor material to the determination of disability and that Harris therefore was not disabled under the Act. *Id.* at 27-28.

## STANDARD OF REVIEW

Judicial review under the Social Security Act is narrow. The Court asks only whether substantial evidence supports the Commissioner's decision and whether it rests on the correct legal standards. *Winschel*, 631 F.3d at 1178. "[W]hatever the meaning of 'substantial' in other contexts," in the context of judicial review of social security decisions, the threshold "is not high." *Biestek v. Berryhill,* 587 U.S. 97, 103 (2019). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015).

Under this standard, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for the Commissioner's. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Even if the evidence preponderates against the Commissioner's findings, the Court must affirm if substantial evidence supports them. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004).

## DISCUSSION

Harris does not challenge the ALJ's finding that, absent alcohol abuse, he would miss at most one day of work per month rather than two or more.[2] He instead

---

[2] Harris states that he "does not concede" the accuracy of the ALJ's evaluation of his substance use under SSR 13-2p, but he rests his appeal entirely on other grounds and develops no challenge to the materiality finding. Doc. 12 at 4. Any such challenge is therefore "effectively abandoned." *Sanchez v. Comm'r of Soc. Sec.*, 507 F. App'x 855, 856 n.1 (11th Cir. 2013).

argues that the ALJ failed to evaluate the September 2018 opinion of consultative examiner R. Keith Morgan, M.D., as 20 C.F.R. § 416.920c requires, and that the step-five finding cannot stand because the vocational expert's testimony conflicts with the DOT and overstates the number of jobs available in the national economy. Doc. 12 at 3-5. Neither argument warrants reversal.

## I.     Dr. Morgan's Opinion

In September 2018, two-and-a-half years before Harris applied for benefits, Dr. Morgan examined Harris at the Agency's request in connection with an earlier claim. Doc. 8-9 at 27-38. On a form asking for his opinion of Harris's ability to do work-related activities despite his impairments, Dr. Morgan wrote that Harris could sit for one or two hours, stand for thirty minutes to an hour, walk fifty feet, and lift and carry eight to ten pounds. *Id.* at 31. The examination itself was largely unremarkable. Harris walked with a normal gait and no assistive device, and he had normal range of motion, dexterity, and grip, full strength, and clear, unlabored respirations, though with a barrel-shaped chest and diminished breath sounds at the lung bases. *Id.* at 27, 33-34, 37-38.

The ALJ addressed the opinion briefly: "The undersigned acknowledges that there is an opinion in 2018 in the record at Exhibit B4F. This opinion is unpersuasive as it was formed well before the claimant alleges that he was disabled in this case. Therefore, it is not consistent with evidence during the relevant period." Doc. 8-14

at 23. Harris contends that this evaluation violates § 416.920c because it never engages the opinion's supportability or consistency and instead deems the opinion unpersuasive merely because it predates the claim. Doc. 12 at 18-23.

For claims like this one, an ALJ does not defer or give specific evidentiary weight to any medical opinions. 20 C.F.R. § 416.920c(a); *see also Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 897-98 (11th Cir. 2022). The ALJ instead evaluates each opinion's persuasiveness using factors, including supportability, consistency, relationship with the claimant, specialization, and other factors, and must explain how she considered the two most important factors, supportability and consistency. 20 C.F.R. § 416.920c(b)(2), (c). She ordinarily need not articulate the rest. *Id.* § 416.920c(b)(2).

The ALJ's evaluation, though sparse, satisfies that requirement. Her first reason, that the opinion "was formed well before" the period at issue, addresses supportability, which turns on the relevance of "the objective medical evidence and supporting explanations presented by a medical source … to support his or her medical opinion(s)." 20 C.F.R. § 416.920c(c)(1). Dr. Morgan's opinion derived from a single examination conducted years before the relevant period, and which was largely unremarkable. Doc. 8-9 at 31-34; Doc. 8-3 at 20. An opinion supported only by remote evidence is, by the regulation's own terms, weakly supported. *See Santos*

*v. Soc. Sec. Admin., Comm'r*, 731 F. App'x 848, 856 (11th Cir. 2018) (holding that evidence predating the alleged disability period was "of limited relevance").

Her second reason, that the opinion "is not consistent with evidence during the relevant period," Doc. 8-14 at 23, is plainly a consistency finding, *see* 20 C.F.R. § 416.920c(c)(2). The ALJ elsewhere explained that Harris's examinations during the relevant period consistently showed normal respiratory findings. Doc. 8-14 at 15-17, 20-23; *see, e.g.*, Doc. 8-11 at 53, 65, 72, 76-77, 80-81, 94; Doc. 8-12 at 5, 8, 16, 28, 30, 38, 42; Doc. 8-13 at 2, 6, 14, 26, 35, 44-45. Even his acute COPD episode in November 2022 produced largely normal objective findings, including a clear chest x-ray and a largely unremarkable examination. Doc. 8-14 at 16; *see* Doc. 8-12 at 2-17. He later testified that weather changes still cause COPD flare-ups and that walking leaves him winded, but that albuterol keeps him from becoming "completely winded," Doc. 8-3 at 86, and he acknowledged at the second hearing that he continued to manage his COPD with albuterol, Doc. 8-14 at 68. It is, at the very least, reasonable for the ALJ to contrast Dr. Morgan's opinion with that record. Nor was the ALJ required to recount all of the specific facts that she considered when she evaluated Dr. Morgan's opinion, as courts may read an "ALJ's decision as a whole," and "it would be a needless formality to have the ALJ repeat substantially similar factual analyses" in every part of her opinion. *Raper v. Comm'r of Soc. Sec.*,

11

89 F.4th 1261, 1275-76 (11th Cir. 2024) (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004)).

Harris's counterarguments do not change that conclusion. He first insists that the timing of an opinion bears only on the "relationship with the claimant" factor, or the catchall "other factor[s]," and so cannot provide the necessary supportability and consistency analysis. Doc. 12 at 19-20; Doc. 16 at 4-5. That argument is weak, as it begs the question, assuming the very thing that must be demonstrated: that the ALJ failed to conduct a supportability or consistency analysis. And it fails because the factors an ALJ considers are not sealed compartments; they may sometimes interrelate and overlap. *Cf. Michael R. v. Comm'r of Soc. Sec.*, No. 2:22-cv-4117, 2024 WL 688754, at *3 (S.D. Ohio Feb. 20, 2024); *Shea M. v. Kijakazi*, No. 1:21-cv-02204, 2023 WL 3040602, at *12 (D.D.C. Apr. 21, 2023). The date of an examination is part of the examining relationship, true; it also determines whether the evidence supporting an opinion is relevant to the period under review and whether the opinion squares with the evidence from that period. *See Santos*, 731 F. App'x at 856. Nor did the ALJ treat the opinion's age as disqualifying in itself; she explained that an opinion formed well before the period at issue did not fit the evidence from that period. Doc. 8-14 at 23. That is plainly a consistency finding, and Harris provides nothing substantive to dispute that fact. *See* Doc. 12 at 20.

12

Harris next argues that the explanation is conclusory, that the ALJ identified no particular contradicting evidence, and that the Commissioner's brief supplies the missing analysis in violation of *SEC v. Chenery Corporation*, 318 U.S. 80 (1943). *See* Doc. 16 at 6-11. The Court disagrees and does not rely on the Commissioner's rationalizations to reach that conclusion. It instead relies on the reasons the ALJ herself gave in the decision she wrote, including her detailed discussion of the respiratory evidence contained within the record. Doc. 8-14 at 15-17, 20-23; *see also, e.g.*, Doc. 8-11 at 53, 65, 72, 76-77, 80-81, 94; Doc. 8-12 at 5, 8, 16, 28, 30, 38, 42; Doc. 8-13 at 2, 6, 14, 26, 35, 44-45. Reading that discussion alongside her evaluation of Dr. Morgan's opinion is not a "post hoc rationalization," Doc. 16 at 11, but is instead exactly how the Eleventh Circuit instructs courts to read ALJ decisions, *see Raper*, 89 F.4th at 1275-76.

Nor does *Rich v. Commissioner, Social Security Administration*, No. 23-12796, 2024 WL 3634230 (11th Cir. Aug. 2, 2024), require more. There, "[t]he Commissioner argue[d] that the ALJ did not have to consider that report," and did "not otherwise argue that the ALJ nonetheless properly evaluated the" report. *Id.* at *2. The Eleventh Circuit, unsurprisingly, could not discern anywhere in the ALJ's opinion where the ALJ had assessed the supportability or consistency of the report, *id.* at *4, whereas the ALJ here addressed both factors, *see* Doc. 8-14 at 19-23.

The parties also dispute whether an ALJ must evaluate pre-application opinions at all. The Commissioner argues that *Ball v. Social Security Administration, Commissioner*, No. 24-12496, 2025 WL 1010204 (11th Cir. Apr. 4, 2025), excuses any such evaluation, *see* Doc. 13 at 6, while Harris contends that *Ball* turned on whether the statement at issue was a "medical opinion" in the first place, Doc. 16 at 3 n.2. The Court need not resolve that dispute because the ALJ here did evaluate Dr. Morgan's opinion, and her stated reasons as to its supportability and inconsistency with the evidence from the relevant period are supported by substantial evidence. That some evidence might have supported crediting the opinion is beside the point, because the Court may not reweigh evidence to arrive at that conclusion. *Dyer*, 395 F.3d at 1210.

## II.   Mail Clerk Occupation and SSR 00-4p[3]

At step five, the burden shifts to the Commissioner to show that jobs the claimant can perform exist in significant numbers in the national economy. *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1278-79 (11th Cir. 2020); *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). The government often carries that burden through vocational expert testimony, and when it does, SSR 00-4p imposes "an

---

[3] On January 6, 2025, SSR 24-3p became effective, thereby rescinding SSR 00-4p. *See* SSR 24-3p, 2024 WL 5256890 (S.S.A. Dec. 6, 2024). The ALJ's decision was made on October 30, 2024, *see* Doc. 8-14 at 9, and so SSR 24-3p does not apply, *see* SSR 24-3p, 2024 WL 5256890, at *2 n.1 ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.").

affirmative duty on the ALJs to identify apparent conflicts" between that testimony and the DOT, "ask the VE about them, and explain how the conflict was resolved in the ALJ's final decision." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1365 (11th Cir. 2018). Taking the expert "at his word that his testimony comports with the DOT" does not discharge the duty. *Id.* at 1362.

Harris identifies an apparent conflict. The RFC limits him, among other things, to understanding, remembering, and carrying out "short, simple tasks and instructions." Doc. 8-14 at 19, 26-27. The mail-clerk occupation requires Level 3 reasoning, *see* DOT 209.687-026, which includes the ability "to carry out instructions furnished in written, oral, or diagrammatic form," and to handle "problems involving several concrete variables," *see* DOT app. C, 1991 WL 688702. The Eleventh Circuit has held that such a pairing creates an apparent conflict the ALJ must resolve. *Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1316-17 (11th Cir. 2021); *see also Keller v. Berryhill*, 754 F. App'x 193, 197-98 (4th Cir. 2018) ("A limitation to short and simple instructions appears more consistent with Reasoning Development Level 1 or Level 2 than with Level 3. Indeed, it seems that such a limitation falls somewhere between Levels 1 and 2.") (internal citations omitted). The vocational expert nonetheless testified, without elaboration, that his testimony was consistent with the DOT, Doc. 8-14 at 79, and the ALJ, despite the Appeals Council's specific instructions to identify and resolve any DOT conflicts,

Doc. 8-15 at 45, did not address the issue. That was error, and the Commissioner does not argue otherwise. *See* Doc. 13 at 11-16.

Harris contends that the error requires remand, quoting *Viverette*'s admonition that a court "can't disregard the error … on the grounds that no conflict in fact existed." Doc. 16 at 12-13 (quoting *Viverette*, 13 F.4th at 1318). The Court does not disregard the error, but rather asks whether it harmed Harris. It did not.

When an unresolved conflict removes one occupation that the ALJ found to be available to the claimant, remand is unnecessary if the remaining occupations still supply a significant number of jobs. *See Acosta v. Acting Comm'r of Soc. Sec.*, No. 24-12495, 2025 WL 1672408, at *2 (11th Cir. June 13, 2025) ("If a claimant would not be entitled to benefits even absent an alleged error, that error is considered harmless."). *Viverette* is not to the contrary. There, the compromised occupation accounted for the great bulk of the identified jobs, and the court declined to say in the first instance that the "relatively low number" of remaining positions was significant. 13 F.4th at 1319 n.3; *see also id.* at 1317-19; *Farias v. Bisignano*, No. 24-cv-61193, 2025 WL 2718761, at *11 (S.D. Fla. Sept. 24, 2025) (holding that courts may "evaluate whether the remaining jobs exist in significant numbers, such that the ALJ's error was harmless, where the number of positions under consideration, after excluding the error-tainted job, are remarkably higher than the relatively low number of positions in *Viverette*."). Here, setting the mail-clerk

16

occupation aside entirely, the vocational expert identified 195,000 other jobs, including 75,000 photocopy-machine-operator positions and 120,000 counter-clerk positions.[4] Doc. 8-14 at 27, 78.

Harris would distinguish *Acosta* on the grounds that his challenge asserts impossibility rather than mere error, includes a request for judicial notice of government data, and is backed by competing estimates of the true numbers. Doc. 16 at 14. Those points bear on whether the remaining figures themselves survive— the question the Court takes up next. They do not touch the principle for which the Court cites *Acosta*: an unresolved conflict as to one occupation does not require remand when another occupation independently supplies a significant number of jobs. 2025 WL 1672408, at *2. As explained below, the counter-clerk figure survives, and 120,000 jobs is a significant number under this Circuit's precedent. *See Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (finding 80,000 jobs nationwide significant); *Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 934-35 (11th Cir. 2015) (finding 23,800 jobs nationwide significant).

## III. Vocational Expert's Job Numbers

Harris's remaining argument attacks the job numbers themselves. He asks the Court to take judicial notice of Bureau of Labor Statistics data showing that the

---

[4] The Commissioner puts the remaining figure at 179,000. Doc. 13 at 11. The expert's numbers in fact sum to 195,000. The miscalculation is immaterial.

Standard Occupational Classification (SOC) group containing the photocopy-machine-operator title includes only 27,960 jobs in total, and that the group containing the mail-clerk title includes only 66,000, each figure well below the expert's estimate for the single DOT title within it. Doc. 12 at 10-14, 29-33. As for the counter clerk position, Harris concedes that the expert's figure of 120,000 fits within the 390,300 jobs in the corresponding SOC group. *Id.* at 11. But he contends that Occupational Requirements Survey data shrink the plausible pool, for the entire group, to roughly 56,463 light and sedentary jobs allowing a sit-stand option, and that a JobBrowser Pro report estimates the counter-clerk occupation itself at about 936 jobs. *Id.* at 11-13, 31-33. In reply, he adds a JobBrowser Pro report estimating fewer than 5,000 photocopy-machine operator jobs and submits that, in place of the roughly 299,000 jobs the expert identified, fewer than 6,000 exist nationally.[5] Doc. 16 at 14; Doc. 16-1. And he argues that the expert's mistaken testimony about consistency with the DOT, together with the claimed impossibility of two of his three figures, makes the third figure suspect as well. Doc. 12 at 28-29; Doc. 16 at 13.

The Commissioner answers first that Harris forfeited this challenge because his counsel stipulated to the expert's qualifications and never questioned his figures at the hearing. Doc. 13 at 11-16. The Court will consider the argument nonetheless,

---

[5] Harris states that the expert identified 261,000 jobs. Doc. 16 at 14. The expert's figures sum to 299,000 (75,000 plus 104,000 plus 120,000). Like the Commissioner's miscalculation, *see supra* note 4, the discrepancy is immaterial.

as the Supreme Court has been reluctant to graft judicially created issue-exhaustion requirements onto Social Security proceedings, *see Sims v. Apfel*, 530 U.S. 103, 107-12 (2000); *Carr v. Saul*, 593 U.S. 83, 88-96 (2021), and the Eleventh Circuit entertained a similar first-time challenge in *Goode*, 966 F.3d at 1280-84. Whether vocational testimony clears the "not high" substantial-evidence bar is assessed case by case, in an approach that "takes into account all features of the vocational expert's testimony, as well as the rest of the administrative record," *Biestek*, 587 U.S. at 103, 108. An estimate that went unchallenged at the hearing, though counsel cross-examined the expert on other subjects, nevertheless carries more assurance than one the expert refused or failed to defend. *Id.* at 105-07; Doc. 8-14 at 77, 80-81.

The Court may assume, without deciding, that Harris's juxtaposition of the expert's photocopy-machine-operator estimate against the BLS group total would doom that figure under *Goode*. Even so, the counter-clerk occupation independently carries the Commissioner's burden, and Harris's attack on it fails.

*Goode* condemns vocational testimony that is "wrong, and clearly so." 966 F.3d at 1282. The expert there used the wrong SOC group altogether and then attributed that group's entire total to a single DOT title among sixty-five, an error that "[s]imple common sense" was able to reveal. *Id.* at 1283. No comparable error clearly affects the counter-clerk figure here: 120,000 reasonably falls within the 390,300 jobs the government's statistics report for the group, so no impossibility

19

appears on the face of the record. Nor do the expert's missteps elsewhere condemn this figure simply by association. The unreliability in *Goode* affected every number derived from a shared and mistaken source, whereas here Harris has identified no comparable defect in the counter-clerk estimate, and the Court's substantial-evidence inquiry permits it to examine each figure on the record as a whole. *See Biestek*, 587 U.S. at 108; *Acosta*, 2025 WL 1672408, at *2.

Harris's showing about the counter-clerk position depends on extrapolation. The Occupational Requirements Survey percentages he invokes describe the whole twenty-four-title group, rather than just the counter-clerk occupation. Doc. 12 at 31-32. His subsequent "sit-stand option" discount derived from that survey, *id.*, measures an entirely different accommodation than the RFC requires, as it counts jobs that let workers choose between sitting and standing, Doc. 12-1 at 4, while the ALJ found only that Harris must be able to sit for thirty minutes after every six hours of standing or walking, and six hours is roughly all the standing and walking that light work ordinarily demands anyway, *see* SSR 83-10, 1983 WL 31251, at *5-6 (S.S.A. 1983). And his JobBrowser Pro estimate of 936 jobs is an estimate from outside the record that defines full-time work much more loosely than the agency does and cannot model the RFC's other limitations. *See* Doc. 12 at 32-33 & n.3.

The gap between the expert's figure and Harris's alternatives may show that vocational sources disagree; it does not show that the expert's numbers were

"conjured out of whole cloth." *Goode*, 966 F.3d at 1282. Choosing among competing estimates is exactly the kind of evidentiary reweighing this Court may not undertake, *Dyer*, 395 F.3d at 1210, particularly when the law demands no "precise count of job numbers" and does not expect experts to "formulate opinions with more confidence than imperfect data allows," *Goode*, 966 F.3d at 1284. Thus, the qualified vocational expert's unchallenged estimate plausibly sits within bounds of the government's data, and constitutes substantial evidence supporting the ALJ's conclusion. *Biestek*, 587 U.S. at 105-06; *see* 20 C.F.R. § 416.966(e); *Bryant v. Comm'r of Soc. Sec.*, 451 F. App'x 838, 839-40 (11th Cir. 2012); *Pena v. Comm'r of Soc. Sec.*, 489 F. App'x 401, 402-03 (11th Cir. 2012).

That leaves significance. Harris argues that the national figures should be scaled down to a state's share of the national population, on the model of *Karissa B. v. O'Malley*, 733 F. Supp. 3d 57 (D.R.I. 2024), thereby resulting in his own estimate of roughly 6,000 jobs nationwide shrinking down to about 90 in the state of Alabama. Doc. 16 at 15-17. Harris's projection, however, fails with its premise, because the Court has sustained the expert's counter-clerk figure, and the authorities he collects for the proposition that fewer than 10,000 national jobs is insignificant are inapposite to the 120,000 figure the vocational expert identified. *See Allen*, 816 F.2d at 602; *Atha*, 616 F. App'x at 934-35. Harris's method also misreads the statute. Work exists in the national economy when it exists in significant numbers "either in

the region where such individual lives or in several regions of the country," 42 U.S.C. § 1382c(a)(3)(B); *accord* 20 C.F.R. § 416.966(a)-(b), and nothing suggests that counter-clerk positions are "[i]solated jobs" existing "only in very limited numbers in relatively few locations," *id.* § 416.966(b). The ALJ was thus entitled to rely on the national figure.

In sum, the ALJ erred by failing to resolve the apparent conflict as to the mail-clerk occupation, but the counter-clerk occupation alone, which includes 120,000 jobs, and whose number Harris has not shown to be clearly wrong, satisfies the Commissioner's step-five burden. The ALJ applied the correct legal standards, evaluated Dr. Morgan's opinion as the regulations require, and grounded her decision in substantial evidence. Even if the record could also support different findings, that possibility is immaterial; where substantial evidence supports the ALJ's determination, the Court must affirm. *Crawford*, 363 F.3d at 1158-59.

**CONCLUSION**

Substantial evidence supports the ALJ's denial of Harris's application for supplemental security income, and the ALJ applied the proper legal standards. The Court therefore **AFFIRMS** the Commissioner's decision.

**DONE** and **ORDERED** this 28th day of July, 2026.

_____

**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE
